ELDER & McKINNEY, Appellants, v. W. G. STUART,
    Surviving Partner of CHAS. STUART & SON,
                    Appellee.

Agency: APPARENT AUTHORITY OF SPECIAL AGENT: EVIDENCE: INSTRUC-
    TIONS TO JURY. Prior to April 1, 1887, the defendant firm was
    engaged in shipping grain to the plaintiffs for sale on commission
    and, owing to a "cut" in freight rates by the railroads, was credited
    by the plaintiffs in their monthly statements of account with a rebate,
    on freights paid, of two cents per hundred pounds of grain shipped.
    After the allowance of such rebate had been discontinued by the rail-
    roads, one B., a special agent for the plaintiffs, with authority to
    solicit shipments of grain for sale on commission, made an agreement
    with the defendants, whereby the latter were to receive two cents per
    hundred pounds of grain on all consignments, in addition to the pro-
    ceeds from the sale of such grain by the plaintiff, less freight charges
    and reasonable commissions. It appeared from the evidence that the
    commission charged in such cases was fixed by the trade, and was
    known to both parties; that the freight paid by the defendants after
    April 1, 1887, did not exceed that paid prior to such date with the
    rebate off; that the contract made with the defendants would have
    been without profit to the plaintiffs; and that the making of such con-
    tract was in excess of the authority which the defendants had reason
    to suppose had theretofore been possessed by B. *Held*, that there
    was no evidence of the apparent authority of B. to make said agree-
    ment with the defendants, and that the court, therefore, erred in sub-
    mitting such question to the jury.

*Appeal from Audubon District Court.*—HON. W. N.
                    MACY, Judge.

                FRIDAY, MAY 27, 1892.

    IN 1885, Elder & McKinney were commission mer-
chants at Peoria, Illinois, and Charles Stuart & Son were
purchasing and shipping grain from Audubon and other
points in Iowa on the line of the Chicago, Rock Island
& Pacific Railway Company. At the solicitation of one
John Bryner, acting for the plaintiffs, the defendants
shipped to the plaintiffs during the years from and

including 1885 to June 1, 1889, grain to be sold on com-
mission. During this period the plaintiffs furnished to
the defendants money for use in their business.
Monthly statements were made by the plaintiffs to the
defendant firm showing the condition of the account on
first day of each month. During a part of the time
prior to April 1, 1887, because of a change in the freight
rates to Chicago, the railway company gave a rebate to
certain shippers on its line, or to the commission mer-
chants, of two cents per hundred pounds of grain
shipped to Peoria. This rebate was, by Elder &
McKinney, collected from the railway company on ship-
ments of Charles Stuart & Son, and placed to their
credit, and was shown in each monthly statement of
account until April 1, 1887, when the interstate com-
merce act went into effect; after which no such rebate
was paid by the railway company, nor did the monthly
statements of account by the plaintiffs afterwards show
any credit for any allowance for each hundred pounds.
The last monthly statement, showing the state of the
account as rendered was for June 1, 1889, and gave
a credit balance in favor of the plaintiffs of three thou-
sand, one hundred and ninety-three dollars and five
cents for money loaned and commissions. The accuracy
of the account rendered is not disputed. Charles Stuart
died June 9, 1889, and the defendant W. G. Stuart is
the survivor; and, by way of counterclaim, says that in
October, 1888, the plaintiff firm, through its agent, John
Bryner, agreed with Charles Stuart & Son that, if they
would continue to ship their grain to Peoria, the plain-
tiffs would pay to them two cents per hundred pounds
on all grain theretofore shipped on which it had not
been paid, and also on all that should be thereafter so
shipped, "and would also remit and pay the proceeds of
grain so consigned, less freight charges and reasonable
commissions; that said firm accepted said contract,
and, induced thereby, continued to ship and consign

grain to the plaintiffs; * * * that the plaintiffs have paid the said firm the proceeds of sales of grain so shipped, less freight charges and commissions, and have paid a portion of the two cents per hundred pounds, but refuse to pay the remainder." It is averred that the amount of the shipments on which the two cents per hundred pounds has not been paid is twenty-one million, nine hundred and eighty-nine thousand, seven hundred and fifty pounds, entitling the defendant to a credit of four thousand, three hundred and ninety-seven dollars and ninety-five cents, which, deducting the credits due the plaintiffs, leaves a balance due the defendant of one thousand, one hundred and seventy-seven dollars and forty-two cents, for which he asks judgment. A reply puts in issue the allegations as to the counterclaim, in so far as concerns any contract or understanding to pay two cents per hundred pounds for grain shipped, and specifically denies any authority on the part of Bryner to make any such contract for or on behalf of the plaintiffs. The case was tried to a jury, who returned a verdict for the defendant, and from a judgment thereon the plaintiffs appeal.—*Reversed.*

*H. G. Curtis* and *J. M. Griggs*, for appellants.

*Cummins & Wright* and *Nash, Phelps & Green*, for appellee.

GRANGER, J.—I. The appellee states the principal questions to be considered as follows: "Upon suit being brought, the account of the appellants was admitted, and the amount due under the contract was made the subject of a counterclaim, and so the case was tried and went to the jury. The two principal questains raised upon the trial were: *First*, did Bryner make the contract as alleged in the counterclaim? *second*, if he did, had he actual or apparent right to do so?"

The jury must have found that Bryner did make the contract, and the testimony warrants the conclusion. It must have also found that Bryner "had the actual or apparent right to do so." With regard to the "apparent right" to make such a contract, the court gave the following instruction: "*Ninth*. In the absence of all knowledge or notice of what powers were expressly conferred by the plaintiffs upon Bryner, the firm of Charles Stuart & Son would have the right to deal with him with reference to the scope of the apparent authority with which he was invested and held out to said firm by the plaintiffs. In dealing with Bryner, when he was claiming to act as agent of the plaintiffs, the firm of Charles Stuart & Son was bound, at its peril, to see that he had authority to bind the plaintiffs in that transaction, or that he was acting within the scope of his apparent authority; and in this connection the question is not what authority the plaintiffs intended to give Bryner, but what authority was the firm of Charles Stuart & Son justified, in dealing with him, in believing had been given. The plaintiffs would not be bound by any act not expressly authorized or necessary to carry out the powers expressly conferred, or to accomplish the purpose of the agency, unless they, by their acts and conduct, had apparently clothed him with other or greater powers,—that is, unless they had given him a scope of apparent authority beyond the powers expressly conferred,—and then the plaintiffs would only be bound in case the firm of Charles Stuart & Son did not know of his real authority, and were justified in believing he had the authority claimed, by the acts and conduct of the plaintiffs themselves; and the apparent authority herein required is not the authority assumed or claimed by Bryner without the knowledge or consent of the plaintiffs, but it is the authority apparently conferred upon him by the acts, declarations, and conduct of the plaintiffs themselves, or by the acts and conduct

of Bryner, which were known to and ratified by the plaintiffs."

It is urged that there is error in giving the instruction, because there is no evidence to justify it. The instruction is set out because it indicates the facts essential to an "apparent authority," which are important in discussing the question of evidence on the point. We think the instruction should not have been given. After a careful review of the record, we see no testimony tending to show an apparent authority, unless some statements are disconnected and given a meaning manifestly not intended. Bryner was not a general agent. He was a special agent, with authority to solicit shipments of grain to the plaintiffs for sale on commission. He possessed all the authority embraced within the ordinary and usual scope of such an employment. No word of testimony indicates that Charles Stuart & Son believed, or had reason to believe, that Bryner possessed any greater authority. We must keep in view the business of the plaintiffs and Charles Stuart & Son. The business of the plaintiff firm was to receive and sell grain for a commission. Stuart & Son were shippers of grain to be sold on commission. The commission was the regular one fixed by the trade, and known to the parties. From 1885 to 1888 this course of business was pursued without variation, during which time Bryner was the agent securing the business of Charles Stuart & Son, and he in no way appeared to possess any different authority. As to the two cent rebate from 1885 to April 1, 1887, it does not appear to have been a matter of contract or obligation on the part of the plaintiffs, but the result of a "cut in rates" by the railway company, which went to the benefit of Stuart & Son, and ceased when the rebate was discontinued. In this connection it should be said that, after the interstate commerce act was in force, the rate per cent. to Peoria was made two cents less by the railway company,

so that the profits to Stuart & Son were the same as when the rebate was paid. It is not to be disputed but that, if the contract to pay this two cents per hundred pounds is to be sustained, the result is that Bryner has made a contract by which Stuart & Son shipped grain to the plaintiffs to be sold, and, after deducting the freight, the balance of the market price, with an additional amount to be paid by the plaintiffs, was to be returned to Stuart & Son; for the commissions at all times were less than two cents per hundred pounds.

At this point we should inquire what facts indicated to Stuart & Son that Bryner had such an "apparent authority." Its exercise was in direct conflict with his entire course of procedure and the apparent authority which before that time Stuart & Son had reason to suppose he possessed. The appellee makes an attempt in argument to meet the query, but it is unsatisfactory. It is urged that, after the plaintiffs were informed that Stuart & Son were about to change their shipments to others, they sent Bryner "for the purpose of inducing them to continue their relations with the plaintiffs;" and it is said, "By making this arrangement Bryner succeeded in accomplishing the very object for which he was sent into the state." The argument indicates the appellee's difficulty, for it assumes more than the record warrants, and without which assumption there is no force in the position. It is not to be inferred, in any way, from the record, that the plaintiffs desired a continuance of the relations, except on the basis of their being commission men, to sell for a commission, or that they sent Bryner to make a contract that would defeat the only known object for their continuing the relation. If we concede that, by the plaintiffs sending Bryner to solicit a continuance of the business, and that such act clothed him with apparent authority to make any contract that would preserve the former relation of shippers and commission merchants, as by changing the

rates of commissions or the method of doing the business, we are still without the apparent authority to do what was done in this case; for it was not in the usual and ordinary scope of such an agency, but wholly without and subversive of it. It was a contract to pay for the privilege of doing the work for nothing, and assuming the responsibility connected therewith. If we should apply a rule for general agents, as given by Mr. Mechem in his work on Agency, section 285, that "it may not unreasonably be presumed, where nothing is indicated to the contrary, that such an agent possesses those powers which are commensurate with his undertaking, and which are usually and properly exercised by other similar agents under like circumstances," we have not enough to clothe Bryner with the apparent authority claimed for him; for we do not think an instance is to be found where facts so prominent, and so far exceeding the usual and ordinary powers of an agency, have been construed as indicating apparent authority.

It is said, and it is likely true, that three hundred dollars of the two cents per hundred pound claim was paid after the contract was made. We have some doubt whether evidence of this payment is in the record, but, if it is, it is rather against than for the defendant; for it appears that in the letter of Bryner transmitting it he told Stuart & Son "not to let Elder & McKinney know anything about the three hundred dollars;" and there is nothing to indicate that they paid it, or knew of the payment. In the instruction the rule of law is stated that "the plaintiffs would not be bound by any act not expressly authorized or necessary to carry out the powers expressly conferred, or to accomplish the purpose of the agency, unless they by their acts and conduct had apparently clothed him with other or greater powers; that is, unless they had given him a scope of apparent authority beyond the powers expressly

conferred.'' There is no evidence from which such apparent authority could be found. Such a contract was unusual, unreasonable, and not businesslike, and would indicate the exercise of an undue, rather than apparent, authority by an agent.

We are cited to authorities, and the rule is not to be doubted, that the question of the extent of authority by an agent, where the proof is by parol, is for the jury, and ''it is error for the court to decide the point as a matter of law.'' But such is not this case. Here there is no evidence from which the court or the jury could find the fact, and the error is in permitting the jury to attempt it. Without evidence, the question was not involved in the trial. It is quite evident that the term ''apparent authority'' was intended by the court as something different from ''real authority,'' as both terms are used in the instruction. By apparent authority the court meant, not what was granted, but other authority that Stuart & Son might assume as a result of the ''acts and conduct'' of the plaintiffs. The mere granting of authority is not an act or conduct from which other authority, not by law inferred because within the usual and ordinary scope of employment, can be assumed. There is no greater proof in this case, and, as we have said, the giving of the instruction was error. The question of apparent authority is also included in the tenth, eleventh, and twelfth instructions, but we need not consider it further.

The assignments of error argued are quite numerous, and in some of them we might hold the rulings erroneous; but they seem to be influenced by the views of the court as to this apparent authority of the agent, and we think our discussion of that question will be sufficient to avoid other errors, if any, on another trial. The judgment is REVERSED.